In re William Robert ALVEY, Brenda Elizabeth Alvey, Debtors.

**GREEN RIVER PRODUCTION CREDIT ASSOCIATION, Plaintiff,**

v.

**William Robert ALVEY and Brenda Elizabeth Alvey, Defendants.**

**Bankruptcy No. 48500191.
Adv. No. 4850031.**

United States Bankruptcy Court, W.D. Kentucky.

Dec. 31, 1985.

Charles L. Lamar, Lovett & Lamar, Owensboro, Ky., for plaintiff.

Gary M. Gibbs, West, Ternes, Gibbs & Overfield, Henderson, Ky., for defendants.

Russ Wilkey, Owensboro, Ky., trustee.

## MEMORANDUM OPINION

MERRITT S. DEITZ, Jr., Bankruptcy Judge.

The duty of trust imposed on Chapter 11 debtors in possession and the cost of a breach of that duty are underscored by the case at hand. The case also presents a microcosm of the farm financial crisis which pervades this district, involving as it does the tracing of asset accountability through three bankruptcy cases.

As part of a "full proceeds loan" agreement in 1980, William and Brenda Alvey gave the Green River Production Credit Association a lien on their 1981 grain crop. The agreement provided that the lien was to follow the proceeds of sale of the crop.

Part of the 1981 crop was stored with Wathen's Elevators, Inc., a firm which shortly thereafter filed bankruptcy, seeking Chapter 11 relief. In the course of the Wathen bankruptcy it was determined that farmers like the Alveys with grain in the bins had lost title to the grain and occupied the status of unsecured creditors.[1] A trustee was appointed for the grain elevator, who later was able to make a partial distribution to unsecured creditors, including one of $6,829 to the Alveys. The Green River PCA lien was still in place when the Wathen trustee mailed his check to the Alveys.

Meanwhile the grain elevator collapse, compounding other financial difficulties, had forced the Alveys themselves to petition for Chapter 11 relief (and Mr. Alvey's

---

1. *In re Wathen's Elevators, Inc.,* UCC reclamation cases appearing at 32 B.R. 912 (Bkrtcy.W.D. Ky.1983); and farmer's preference decision reported at 37 B.R. 870 (Bkrtcy.W.D.Ky.1984).

mother, in a separate but related proceeding). The Alveys had been acting as debtors in possession for over a year when they received the trustee's check.

The $6829 was deposited to the Alveys' general farm account in late 1983 and they promptly spent $4362 of it on what they claim were routine farm expenses. As debtors in possession the Alveys did not report as required to this court either the receipt of the check or the payments made out of it. Neither did they seek court authorization to use the encumbered funds, known in bankruptcy parlance as "cash collateral", a decisive fact in our treatment of the case.

The Alvey Chapter 11 proceeding culminated in a substantial liquidation of farm assets, and after sales of land and equipment were completed the Alveys moved for dismissal of the proceeding. The PCA, which earlier had learned independently of the Chapter 11 proceeding about the grain elevator payment to the Alveys, renewed its demand for the secured funds and conditionally objected to dismissal until it was paid. The PCA's objection was noted but overruled in light of a strong court policy favoring voluntary dismissal. The Alvey Chapter 11 case was concluded on January 31, 1985.

Four months later the Alveys, still under creditor pressure, filed the present Chapter 7 petition to escape personal liability on the deficiencies resulting from the Chapter 11 liquidation sales. It is in connection with this Chapter 7 case that the PCA again renews its demand, this time in the form of a nondischargeability complaint alleging that its security was damaged by the Alveys' breach of the duty of trust which accompanied their appointment as Chapter 11 debtors in possession.

At the request of the court and at an early stage in the lawsuit, counsel have filed memoranda of law on the question of whether a cause of action under § 11

U.S.C. § 523(a)(4) (breach of fiduciary duty) may properly lie against a debtor enjoying the protection of a Chapter 11 court at the time of the allegedly improper conduct.

\* \* \* \* \* \*

■ There can be no serious debate as whether a Chapter 11 debtor in possession owes a fiduciary duty to his creditors. Under the Bankruptcy Code the DIP is vested with all of the powers and duties of a trustee, 11 U.S.C. § 1107, and must be held to the high standards of accountability that title connotes. Implicit in the DIP's acceptance of the appointment is the complete subordination of his property to the legitimate claims of his creditors. That submissive posture is part of the price he pays for federal court protection through the reorganization process.

■ Relinquishment of personal control over the disposition of property is absolutely essential to the preservation of those creditors' rights already materially impaired—or at least deferred—by the Chapter 11 filing. The DIP who disposes of property of the Chapter 11 estate without first obtaining court approval does so at this peril.

■ This is particularly true where the property disposed of is subject to a secured claim. The secured creditor has not a simple money demand but a property right enjoying a protection of federal constitutional rank,[2] a far higher degree of protection than that enjoyed by the DIP.[3]

The debtor's complete respect for secured property rights is commanded by the Bankruptcy Code. Section 363(c) requires either creditor consent or prior court approval to use cash collateral, and in the well-managed Chapter 11 case the "motion to use cash collateral" is the very first

---

2. *Continental Illinois Bank & Trust Co. v. Chicago R.I. & Pac. Ry. Co.*, 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110 (1935).

3. The right to receive a bankruptcy discharge "does not rise to the constitutional level". *United States v. Kras*, 409 U.S. 434, 448, 93 S.Ct. 631, 639, 34 L.Ed.2d 626 (1973).

pleading to be filed by the highly-leveraged debtor.[4]

There was no such motion filed in the Alvey case. And far from creditor consent, there was unsatisfied creditor demand from the first actual notice of existence of the funds.

■ Traditional creditor remedies for the unauthorized use of cash collateral are dismissal of the Chapter 11 proceeding or relief from the § 362 automatic stay to allow direct nonbankruptcy action against the collateral. In the Alvey case the creditor sought neither remedy, but cast its objection in the nontraditional form of a objection to dismissal unless it was adequately protected *ex post* by a direct cash payment. In our judgment the creditor demand, however unorthodox, was sufficiently timely in its context, clear and direct that the PCA cannot be deemed to have waived any of its rights through the pendency of the Chapter 11 proceeding.

Now, of course, with the Alveys in a new and separate Chapter 7 proceeding, traditional remedies are neither timely nor appropriate. If the creditor is to prevail, it can only be upon general breach of trust theory.

Section 523(a)(4) of the Bankruptcy Code makes nondischargeable any debt resulting from "fraud or defalcation while acting in a fiduciary capacity".

"Defalcation" has been defined as "failure to meet an obligation; misappropriation of trust funds or money held in any fiduciary capacity; failure to properly account for such funds".[5]

■ Recent caselaw from this court holds that the plaintiff's burden of proof in defalcation cases is significantly less than in a standard § 523(a)(2) fraud case. Proof of actual fraudulent intent is not necessary, and the burden is sustained upon a showing of misapplication of the trust funds.[6]

In briefing the present case, counsel for the debtors is unable to point to any case authority tending to exonerate these defendants from otherwise applicable fiduciary standards simply because they were under Chapter 11 court protection at the time of the acts complained of. We are referred only to a line of general authority to the effect that the presumption of innocence follows a good-faith disposition of collateral in a nonbankruptcy context, making any conversion merely "technical" in nature.

Counsel for the PCA, on the other hand, directs our attention to *In re Langholf,*[7] a recent farm Chapter 11 case from the Northern District of Illinois which imposed the extraordinary penalty of complete denial of a discharge to a farmer-debtor who had failed to adequately explain the loss or dissipation of Chapter 11 assets. While not squarely analogous on its facts and arising in the setting of a converted Chapter 7 proceeding, *Langholf* does correctly state the high standards of accountability of the Chapter 11 DIP and the harsh consequences that can flow from noncompliance with Chapter 11 court requirements. We concur in Judge DeGunther's opinion that "there is no Code provision which exempts the vocation of farming from the duties and responsibilities imposed on Debtors in bankruptcy. It is a small price to pay for the rights and benefits available to a Debtor under Chapter 11."[8]

■ Applying the *Langholf* reasoning to the less dramatic setting of a § 523(a)(4) complaint, we hold that the unauthorized use of cash collateral by a Chapter 11 debtor creates a prima facie case of breach

---

4. A practitioner-lecturer on farm bankruptcies advocates in appropriate cases even a *prepetition* notice of intent to use cash collateral. *Lander, "Keeping the Chapter 11 Debtor Afloat Throughout the Entire Chapter 11 Process,"* (unpublished, 1985), at p. 140.

5. *Black's Law Dictionary* (West Pub.Co. 5th Ed. 1979).

6. *In re James,* 42 B.R. 265 (Bkrtcy.W.D.Ky. 1984).

7. 37 B.R. 414 (Bkrtcy.N.D.Ill.1984).

8. Note 7 *supra,* 37 B.R. at 420.

174

of fiduciary duty in a nondischargeability complaint in a later Chapter 7 proceeding.

That holding alone does not fully dispose of the case before us. Alvey has tendered to the Court, along with his defensive pleadings, photocopies of checks on the farm account presumably drawn to cover ordinary operating expenses. His position obviously is that since the PCA had a lien on virtually all of the farm assets, any expenditures to keep the farm going redounded to the benefit of the PCA by preserving or enchancing the value of its collateral. The theory is a sound one, and brings a nice balance to that intimidating instrument of farm lenders, the "full proceeds loan", which has drawn from this court something less than standing applause.[9]

■ Following Alvey's reasoning through to its conclusion, any farm expenditures which can be traced to the preservation or protection of the PCA's collateral would have been consistent with the farmer's duty of trust, and those amounts should be forgiven; that is, subtracted from the amount of debt determined to be nondischargeable. We endorse the reasoning and will apply it to this case.

But Alvey's theory, at this stage of the proceeding, is only that; he has not properly proven that the expenditures were of the sort they are claimed to be, and the court has no way of knowing whether any particular check represents a bona fide and necessary farm expense, or whether it can be specifically tied to property upon which the PCA had a lien. At a bare minimum the checks should be formally introduced into evidence, with Alvey subject to cross-examination by the PCA on the nature of each expenditure and its relation, if any, to the property he held in trust.

9. *In re Brame*, 23 B.R. 196, 197 (Bkrtcy.W.D.Ky. 1982), characterized the "full proceeds loan" as follows:

In general terms, the full proceeds loan is a medium for restructuring troubled farm loans to minimize potential losses to both borrower and lender. At its best such an arrangement forces a cooperative effort toward resumption of debt service and the reduction of possible

■ By separate order we will provide that the indebtedness of William and Brenda Alvey to the Green River Production Credit Association is nondischargeable under 11 U.S.C. § 523(a)(4) in a maximum amount of $6829, from which amount shall be subtracted those expenditures represented by individual checks proven by the Alveys to have been made for the preservation and benefit of the PCA's collateral. A hearing on the latter issue will be required, also by separate order.

deficiency judgments. At its worst it invites abuse by a lender with plenary dominance over other creditors, or evasion by a borrower in a condition of perceived servitude, or both. The unusual tensions generated by such an arrangement may result in premature or uneconomical liquidation of farm assets with resulting major losses to both parties.