In re Joseph J. SIMPSON d/b/a JS
Associates, Sandpiper
Associates, Debtor.

**ESTATE OF John Malcolm
NEILSON, Plaintiff,**

v.

**Joseph J. SIMPSON, Raymond Patryn,
Esq., Trustee, Defendants.**

Bankruptcy No. 81–652.
Adv. No. 83–0140.

United States Bankruptcy Court,
D. New Hampshire.

Feb. 2, 1984.

Kenneth E. Churbuck, Nashua, N.H., for debtor/defendant.

Michael Bently, Keene, N.H., for Estate of John Neilson.

JAMES A. GOODMAN, Bankruptcy Judge.

## MEMORANDUM OF DECISION

This is an action to determine the dischargeability of specific debts owing to the estate of John Neilson. From the evidence submitted, the Court finds the following facts. The debtor, Joseph J. Simpson, was a friend of the deceased, John Malcolm Neilson, for over three years. On June 18, 1979, the debtor co-signed a personal demand note between Neilson and the Nashua Trust Company for $13,312.00. Neilson used most of the proceeds of that loan to pay debts he owed to a corporation of which the debtor was president, director and controlling stockholder. On November 25, 1979, Neilson died. On July 29, 1980, the debtor was appointed administrator of Neilson's estate by the Probate Court.

The debtor established the probate estate bank account at the Nashua Trust Company. In his capacity as administrator, the debtor authorized Nashua Trust Company to withdraw $6,859.81 from the estate account and apply it to the balance due on the June 18th demand note upon which Neilson and the debtor were obligated. Nashua Trust transferred the money on February 13, 1981.[1]

The debtor's final account, dated March 14, 1982 and thereafter filed with the Probate Court, shows that the probate estate is insolvent; assets total less than $13,000

1. The evidence indicates that three other payments to Nashua Trust on the same note were authorized by the debtor, totalling $337.36, between December 15, 1980 and February 15, 1981.

while debts exceed $475,000. The debtor testified that *before* he filed his account he paid himself certain administrative fees. The debtor was aware that his fees were subject to court review and approval; in fact, the Probate Court later disallowed approximately $1700 of the claimed administrator's fees. The Probate Court also found that the disbursement of $6,859.81 to Nashua Trust Co. was improper, and accordingly disallowed it. The Court ordered the debtor to repay the estate the sum of $7,427.04. That sum has not been repaid, and is the subject of this action to determine dischargeability.

The debtor testified that at the time he authorized the payments to Nashua Trust, he was aware of his obligations as co-signer of the demand note, but was unaware that Neilson's estate was insolvent. The debtor testified that Neilson's parents were well off, and that he believed either the probate estate or Neilson's family would eventually satisfy that obligation. The debtor also testified that before authorizing payments, he consulted with Joseph L. Cluff, Esq., attorney for the estate, who told him (1) that he had the authority to pay Nashua Trust, but (2) that such payments could be challenged at a later time should claims for additional debts be filed. Mr. Cluff testified that *he* was aware that the Probate estate was insolvent in February of 1981. Before he knew the estate was insolvent, Cluff advised the debtor that Nashua Trust could be paid. He could not remember, however, whether the debtor specifically asked him in February, 1981 about authorizing the $6,859.81 payment.[2]

Title 11 U.S.C. § 523(a)(4) provides that a discharge "does not discharge an individual debtor from any debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny...." There is no doubt that the debtor was acting in a fiduciary capacity when the debts here in question were incurred. The issue to be determined is whether the debts arose from "fraud or defalcation."

Under section 17a(4) of the repealed Bankruptcy Act of 1898 (hereafter "Act"), a discharge did not release a bankrupt from debts "created by his fraud, embezzlement, misappropriation or defalcation while acting as an officer or in any fiduciary capacity...." 11 U.S.C. § 35(a)(4) (repealed). This section was discussed in *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937). In that case, Herbst, the receiver of a parcel of realty in a foreclosure suit, was allowed $5,674.54 in fees by the lower court. Without waiting for the appeal period to run and without inquiring whether the plaintiff intended to appeal, Herbst withdrew the money and spent it. An appeal was filed, and the receiver's fees disallowed. Herbst failed to fully repay the $5,674.54. Herbst then declared bankruptcy, and the issue before the court was the dischargeability of that debt.

Arguendo we shall assume that Herbst's withdrawal of the money was neither a "fraud," "embezzlement," nor "misappropriation," for we think that in any event it was a "defalcation." Under the Act of 1800, 2 Stat. 19, 30 (section 34), a discharge relieved bankrupts of all their debts without exception, provided they

---

2. While the debtor testified at trial that he did authorize the $6,859.81 transfer, the Court notes that prior to the trial the debtor consistently denied ever having authorized the payment to Nashua Trust. For example, in an October 4, 1982 letter signed by the debtor and addressed to the Probate Court, the debtor stated that he "did not authorize the withdrawal of funds from the John M. Neilson account by Nashua Trust Co., therefore the funds if determined to have been withdrawn without cause should be replaced by the Nashua Trust Co." In addition, a "Memorandum in Support of Administrator's Final Account," filed with the Probate Court in October, 1982, states that at

no time did the debtor "authorize directly or indirectly" the removal of $6,859.81. Indeed, the debtor's answer to plaintiff's complaint in the instant proceeding, filed June 15, 1983, states:

That the debtor had no control over the funds alleged as the evidence submitted indicates the Nashua Trust, on its own accord, applied these funds to any indebtedness, without the Debtor's knowledge or permission at the time....

The debtor's inconsistent statements concerning such an important fact lead this Court to discount his testimony.

conducted themselves properly; but the statute applied only to those engaged in commerce and was confined to involuntary bankruptcies. Under section 4 of the Act of 1841 (5 Stat. 443) a discharge also relieved bankrupts of all their debts, but for the first time and after much dissension voluntary bankruptcy was provided for. The word, "defalcation," first appears in section 1 of that act (5 Stat. 440) and only as part of the definition of those who might become voluntary bankrupts; they were those who did not owe debts "created in consequence of a defalcation as a public officer; or as executor, administrator, guardian or trustee, or while acting in any other fiduciary capacity." Colloquially perhaps the word, "defalcation," ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts. It must be remembered that the "fiduciary capacity" was limited to "special" or "technical" fiduciaries. *Chapman v. Forsyth,* 2 How. 202, 208, 11 L.Ed. 236. Section 11 of the Act of 1867 (14 Stat. 521) removed the former limitations of the Act of 1841 upon voluntary bankruptcies, and involuntary petitions were [no] longer confined to those engaged in commerce (section 39, 14 Stat. 536). However, for the first time not all debts were discharged, the exceptions appearing in section 33, 14 Stat. 533, which incorporated the old clause of section 1, compressed into the words, "defalcation as a public officer, or while acting in any fiduciary character," before which it interpolated the phrase, "the fraud or embezzlement of the bankrupt." Whatever was the original meaning of "defalcation," it must here have covered other defaults than deliberate malversations, else it added nothing to the words, "fraud or embezzlement." We do not understand that the Supreme Court questioned this in *Crawford v. Burke,* 195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147, where it held that the suffix "as a public officer" etc., which had limited only "defalcation" in the Act of 1867, applied to the whole of subdivision 4 of the Act of 1898. The successful argument there was that otherwise part of subdivision two would have been covered by "fraud" in subdivision four, and that reasoning became even more persuasive after 1903, when subdivision two was no longer limited to "judgments," but included all "liabilities" for getting money or property by fraud.

It does not seem to us, however, that this linkage of "fraud" and "embezzlement" to "defalcation" need change its meaning in the Act of 1867. It is true that "embezzlement" certainly, and perhaps "fraud" too, become redundant when the suffix is attributed to them; *Crawford v. Burke,* supra, 195 U.S. 176, 25 S.Ct. 9, 49 L.Ed. 147, avoided that vice as between the two subdivisions at the expense of creating it within subdivision four itself. But that is no reason for going still further and reducing "embezzlement" and "defalcation" to synonyms, especially after the interpolation of "misappropriation" between them, which, though indeed a baffling word at best in this context, may have been put in to avoid traditional limitations clinging to the word, "embezzlement."

We must give the words different meanings so far as we can, especially when a contrary interpretation would wrest "defalcation," if not from its original meaning, at least from that which it must have had in the Act of 1867. . . .

In the case at bar the bankrupt had not been entirely innocent—not, for instance like the victim of an employee—though possibly one may acquit him of deliberate wrongdoing. A judge had awarded him the money, and prima facie he was entitled to it; but he knew, or if he did not know, he was charged with notice (having held himself out as competent to be an officer of the court), that the order would not protect him if it were reversed; and that it might be reversed until the time to appeal had expired. He made no effort to learn from the plaintiff whether it meant to appeal, and he did not wait

until it could no longer do so; he took his chances. We do not hold that no possible deficiency in a fiduciary's accounts is dischargeable; *In Re Bernard,* 87 F.2d 705, 707 [(2nd Cir.1937)], we said that "the misappropriation must be due to a known breach of the duty, and not to mere negligence or mistake." Although that word probably carries a larger implication of misconduct than "defalcation," "defalcation" may demand some portion of misconduct; we will assume arguendo that it does.

All we decide is that when a fiduciary takes money upon a conditional authority which may be revoked and knows at the time that it may, he is guilty of a "defalcation" though it may not be a "fraud," or an "embezzlement," or perhaps not even a "misappropriation."

*Herbst,* 93 F.2d at 511–12.

Before applying the holding of *Herbst* to the facts in the instant case, the Court must first determine whether *Herbst* remains good law after the enactment of the Bankruptcy Reform Act of 1978 (hereafter "Code"). In 1970, the Commission on the Bankruptcy Laws of the United States was established by Congress to study, analyze, evaluate, and recommend changes in the Bankruptcy Act. In 1973, the Commission filed its report, which included a draft of a new bankruptcy law. Section 4–506(5) of this draft would except from discharge "any liability for embezzlement or larceny." *Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 93–137, 93d Cong., 1st Sess., Pt. II, 136 (1973) *reprinted in* 2 app. *Collier on Bankruptcy* 136 (15th ed. 1983). The Note following section 4–506 states that clause (5) thereof replaces § 17a(4) of the Bankruptcy Act of 1898:

> The limiting words, "while acting as an officer or in any fiduciary capacity," the scope of which is controverted under the present Act, are eliminated. Thus, for

example, the uncertainty whether this ground for nondischargeability applies only to a corporate or public officer or extends also to a corporate employee, partner, or other agent ... is abolished.

> The terms "misappropriation" and "defalcation" are discarded as overbroad and uncertain in meaning. See *Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510 (2d Cir.1937). The standard of "fraud" is moved to a more appropriate location in clause (2), and the precisely definable term "larceny" is added to the remaining term "embezzlement" to cover conduct clearly within the intended scope of this ground for nondischargeability.

*Id.* at 139.

■ The House adopted this provision. Thus, section 523(a)(4) of H.R. 8200 excepts from discharge debts "for embezzlement or larceny." H.R. 8200, 95th Cong. 1st Sess. as reported by the House Committee on the Judiciary, September 8, 1977 *reprinted in* 3 app. *Collier on Bankruptcy* III–405 (15th ed. 1983). The Senate, however, apparently did not agree with all of the Commission's recommendations. Section 523(a)(4) of S.2266 excepted from discharge debts for "fraud while acting in a fiduciary capacity, defalcation, embezzlement, or misappropriation." S.2266, 95th Cong., 2d Sess. as reported by the Senate Judiciary Committee and the Senate Finance Committee, 1978 *reprinted in* 3 app. *Collier on Bankruptcy* VIII–416 (15th ed. 1983). The final version, enacted as 11 U.S.C. § 523(a)(4), deletes from section 17a(4) of the Act the limiting words "while acting as an officer," but retains the standard of "defalcation" *for fiduciaries.* Thus, Congress in essence adopted the Commission's recommendations in full for all debtors except fiduciaries. Clearly Congress recognized a fiduciary's "special legal status with respect to another, with its attendant duties and high standards of dealing,"[3] and *intended to preserve* what the

---

**3.** *Carlisle Cashway, Inc. v. Johnson (In re Johnson),* 691 F.2d 249, 256 (6th Cir.1982) (Act case). "The traditional definition of a 'fiduciary' is not applicable in bankruptcy law. The general meaning—a relationship involving con-

fidence, trust and good faith—is far too broad. The fiduciary relationship referred to in § 523(a)(4) has been held to be limited to express and technical trusts." *Rhode Island Lottery Commission v. Cairone (In re Cairone),* 12

Commission termed the "overbroad" standard of "defalcation" in determining the dischargeability of a fiduciary's debts. Therefore, the Court concludes that with respect to fiduciaries, cases such as *Herbst* construing "defalcation" under the Act of 1898 continue to be persuasive authority under the new Code. *See, e.g., Gonzales v. Raiser Construction Co., Inc. (In re Gonzales),* 22 B.R. 58, 59, 9 B.C.D. 447, 448 (Bkrtcy.App. 9th Cir.1982) (quoting *Herbst*); *Western Surety Co. v. Meek (In re Meek),* 25 B.R. 58, 60 (Bkrtcy.D.Ore.1982) (relying upon *Herbst*); *Merrywell v. Barwick (In re Barwick),* 24 B.R. 703, 705–06 (Bkrtcy.E.D.Va.1982) (relying on *Herbst*); *Joseph Lorenz, Inc. v. Thomas (In re Thomas),* 21 B.R. 553, 558–59, 8 C.B.C.2d 832, 838–39 (Bkrtcy.E.D.Wis.1982) (quoting *Herbst*) *affd.,* 34 B.R. 103, 8 C.B.C.2d 840 (D.C.E.D.Wis.1983); *Rhode Island Lottery Commission v. Cairone (In re Cairone),* 12 B.R. 60, 63, 4 C.B.C.2d 999, 1002–03 (Bkrtcy.D.R.I.1981) (quoting *Herbst*).

█ In the instant case, the debtor's actions with respect to the disallowed administrator's fees parallel the actions of Herbst: the debtor withdrew his fees from the probate estate despite his knowledge that the fees were subject to Probate Court review. Indeed, unlike Mr. Herbst, the debtor here had not even received conditional approval from a court when he paid himself out of estate funds. As for the payment to Nashua Trust, the debtor again knew when he authorized it that the payment was subject to approval by the Probate Court, and that it might be challenged if other claims against the estate were forthcoming. The evidence indicates that at the time of the $6,859.81 payment, the estate's *attorney* was aware that the estate was insolvent. This knowledge should have been equally available to the debtor, since Attorney Cluff testified that he first realized the estate was insolvent when Neilson's father's claim was filed.[4] There is no evi-

dence of what, if anything, the debtor did to apprise himself of the estate's true financial condition at the time of the transfer to Nashua Trust. The Court finds that the debtor either knew or should have known at the time of the transfer to Nashua Trust that Neilson's estate was insolvent. The Court sees little difference between a receiver who takes money for his own benefit where he knew or should have known that the authority to do so was subject to reversal, and an administrator who pays an estate debt that benefits himself where he knew or should have known that the payment was likely to be challenged and was subject to court approval. In either case, a "defalcation" has occurred.[5] Accordingly, the debt of $7,427.04 owed to the plaintiff is determined to be non-dischargeable.

Enter order.

---

B.R. 60, 62, 4 C.B.C.2d 999, 1001 (Bkrtcy.D.R.I.1981).

**4.** The debtor's final account lists a debt for $343,629.20 owed to Henry L. Neilson.

**5.** Because the Court finds that the debtor is guilty of misconduct, it need not determine whether an "innocent default" by a fiduciary would constitute "defalcation."